### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| MARK TOBIAS, derivatively on behalf of WALGREENS BOOTS ALLIANCE, INC., <br><br> Plaintiff, <br><br> vs. <br><br> TIMOTHY C. WENTWORTH, MANMOHAN MAHAJAN, RICK GATES, JANICE M. BABIAK, INDERPAL S. BHANDARI, GINGER L. GRAHAM, BRYAN C. HANSON, ROBERT L. HUFFINES, VALERIE B. JARRETT, JOHN A. LEDERER, STEFANO PESSINA, THOMAS E. POLEN, and NANCY M. SCHLICHTING, <br><br> Defendants, <br><br> and <br><br> WALGREENS BOOTS ALLIANCE, INC., <br><br> Nominal Defendant. | Case No.: <br><br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR:** <br><br> **(1) VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934;** <br> **(2) BREACH OF FIDUCIARY DUTY;** <br> **(3) UNJUST ENRICHMENT;** <br> **(4) ABUSE OF CONTROL;** <br> **(5) GROSS MISMANAGEMENT; AND** <br> **(6) WASTE OF CORPORATE ASSETS** <br><br> JURY TRIAL DEMANDED |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

### INTRODUCTION

Plaintiff Mark Tobias ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Walgreens Boots Alliance, Inc. ("WBA" or the "Company"), files this Verified Shareholder Derivative Complaint against individual defendants Timothy C. Wentworth ("Wentworth"), Manmohan Mahajan ("Mahajan"), Rick Gates ("Gates"), Janice M. Babiak ("Babiak"), Inderpal S. Bhandari ("Bhandari"), Ginger L. Graham ("Graham"), Bryan C. Hanson ("Hanson"), Robert L. Huffines ("Huffines"), Valerie B. Jarrett ("Jarrett"), John A.

1

Lederer ("Lederer"), Stefano Pessina ("Pessina"), Thomas E. Polen ("Polen"), and Nancy M. Schlichting ("Schlichting") (collectively, the "Individual Defendants," and together with WBA, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of WBA, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of Sections 14(a), 10(b), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding WBA, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a shareholder derivative action that seeks to remedy wrongdoing committed by WBA's directors and officers from October 12, 2023 to June 26, 2024, inclusive (the "Relevant Period").

2. WBA is a Delaware corporation headquartered in Illinois, that has a 170-year history of providing care to customers and patients through its integrated healthcare, pharmacy, and retail stores.

3. WBA is one of the largest retail pharmacy, health, and daily living corporations within the United States and Europe. With its Walgreens, Boots, Duane Reade, Benavides, and Ahumada drugstores, WBA provides pharmaceutical, retail, and healthcare services to customers

within 9 countries spread across the United States, Europe, and Latin America. WBA further reaches customers through its products such as No7, Soap and Glory, Free and Pure, NICE!, Liz Earle, Botanics, Sleek MakeUP, and YourGoodSkin.

4.     During the Relevant Period, Defendants overstated the Company's expected revenue for the 2024 Fiscal Year.[1] Specifically, Defendants falsely and materially claimed confidence in the brand inflation, volume growth, cost execution, discipline, and overall contributions of WBA's pharmacy division.

5.     On October 12, 2023, the Company published a press release that announced its guidance for the upcoming 2024 Fiscal Year (the "FY 2023 Press Release"). Within the FY 2023 Press Release, the guidance for the upcoming year contained an expected "adjusted EPS of $3.20 to $3.50, with underlying earnings growth more than offset by lower sale and leaseback contribution, a higher tax rate, and lower COVID-19 contribution." Additionally, the FY 2023 Press Release revealed an expected "adjusted EBITDA to be breakeven at the midpoint of the guidance range of ($50) to $50 million."

6.     On an earnings conference call that same day (the "FY 2023 Earnings Call"), Defendant Mahajan reiterated these points, stating that "we expect U.S. retail pharmacy underlying adjusted operating income to be ***driven by immediate actions to improve the cost base and modest underlying growth in both retail and pharmacy.***"[2] Defendant Mahajan further explained this expected growth by explaining the "prudent approach" the Company intends to take, through which Defendants predicted "sequential improvement" beyond the first quarter. Defendant

---

[1] WBA's fiscal year does not mirror the calendar year but rather begins on September 1st and concludes on August 31st of each year.
For the period between September 1, 2022 to August 31, 2023 (the "2023 Fiscal Year")
For the Period between September 1, 2023 to August 31, 2024 (the "2024 Fiscal Year")
[2] All emphasis is added unless otherwise noted.

Mahajan described this approach as: (1) "we're executing a series of actions to lower our cost base;" (2) in the "U.S. Healthcare segment, we expect profitability to improve from optimizing the clinic footprint, growing patient panels, and realigning costs;" (3) "we expect growing contributions from retail initiatives, including sequentially improving retail comps and margin expansion programs;" and (4) "seasonality plays a role in our business, benefitting the second quarter, which is usually the height of the cough, cold, flu season in the U.S. and is when Boots U.K. sees significant profit driven by the holiday season."

7.      In making these false and material statements, Defendants veiled the reality: that WBA's pharmacy division was not actually equipped to adapt to ongoing hurdles within the industry and the Company would instead require significant restructuring in order to create a sustainable model. As a result of withholding this information, shares of the Company's stock were valued at artificially inflated prices.

8.      The truth emerged on June 27, 2024 with the release of a press release detailing WBA's third quarter earnings for the 2024 Fiscal Year (the "3Q 2024 Press Release"). The 3Q 2024 Press Release revealed disappointing results, stating that "[a]djusted EPS was $0.63, ***down 36.6 percent on a constant currency basis compared to the year-ago quarter***." Further, the 3Q 2024 Press Release announced lower projections for the upcoming fourth quarter and year-end, stating that the Company was "[l]owering fiscal 2024 adjusted EPS guidance to $2.80 to $2.95 ***reflecting challenging pharmacy industry trends and a worse-than-expected U.S. consumer environment***."

9.      In an earnings call on the same day (the "3Q 2024 Earnings Call"), Defendant Wentworth explained the disappointing guidance, stating that

> In ***U.S. Retail Pharmacy, we witnessed continued pressure on the U.S. consumer. Our customers have become increasingly selective and price-sensitive in their***

*purchases. In response, we invested in targeted promotion and price decisions which have driven traffic and will generate improved customer loyalty, but they weigh on near-term profitability as we refine our approach*. We remain relentlessly focused on enhancing the front of store and creating the right omnichannel experience for our customers while driving in-store efficiencies.

Defendant Wentworth further went on to discuss the sustainability of the current pharmacy model, stating that "[r]ecent trends, such as branded mix impacts and increased regulatory and reimbursement pressures, including fluctuations in NADAC pricing, have negatively impacted pricing dynamics." Further, Defendant Wentworth admitted that "*[w]e are at a point where the current pharmacy model is not sustainable*, and the challenges in our operating environment require we approach the market differently."

10. On this news, the price per share of WBA stock fell $3.47, or 22.2%, from its closing price on June 26, 2024 of $15.66 per share to close on June 27, 2024 at $12.19 per share.

11. During the Relevant Period, the investing public was under a false impression of the Company's business, operations, and financial success.

12. In addition, during the Relevant Period, the Individual Defendants breached their fiduciary duties by causing WBA to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations. Indeed, in October 2023, approximately 3.1 million shares of WBA common stock were repurchased, costing the Company over $69.3 million. As the Company's stock was actually worth only $12.19 per share, the price at which it was trading when markets closed on June 27, 2024, the Company overpaid for repurchases of its own stock by *over $31.5 million in total*.

13. In breach of their fiduciary duties, the Individual Defendants failed to maintain internal controls.

14. Moreover, during the Relevant Period, the Individual Defendants, in breach of their

fiduciary duties owed to WBA, willfully or recklessly made and/or caused the Company to make false and misleading statements. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) WBA did not have sufficient or effective risk management or compliance controls and procedures; (2) as a result, WBA overemphasized confidence in the pharmacy division's ability to carry the Company; (3) this confidence was misplaced as the pharmacy division was not actually equipped to adapt to ongoing hurdles within the industry; (4) as a result, WBA must undergo significant restructuring in order to create a sustainable model; (5) as a result of withholding this information, shares of the Company's stock were valued at artificially inflated prices; and (6) once these failures were disclosed, the Company would be subjected to financial risk, enhanced regulatory oversight, and reputational harm. As a result of the foregoing, statements about the Company's business, operations and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

15. The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

16. In light of the Individual Defendants' misconduct—which has subjected the Company, its Chief Executive Officer ("CEO"), its Senior Vice President ("SVP") and Global Chief Financial Officer ("CFO"), and its SVP and Chief Pharmacy Officer ("CPO") to a federal securities fraud class action lawsuit pending in this Court (the "Securities Class Action") and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by

the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

17.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

18.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, the majority of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action, and of their not being disinterested or independent directors, a majority of the Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1) and Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78t(a) and 78t-1, and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder. Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

20.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

21.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

22.     Venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of the Defendants either resides

or maintains executive offices in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

23.     Plaintiff is a current shareholder of WBA. Plaintiff has continuously held WBA common stock since first purchasing the stock on December 15, 2022.

### Nominal Defendant WBA

24.     WBA is a Delaware corporation with its principal executive offices at 108 Wilmot Road, Deerfield, Illinois 60015. WBA's shares trade on The Nasdaq Stock Market LLC ("NASDAQ") under the ticker symbol "WBA."

### Defendant Wentworth

25.     Defendant Wentworth has served as the Company's CEO and as a director since October 2023.[3]

26.     The Company's Schedule 14A filed with the SEC on December 8, 2023 (the "2023 Proxy Statement") stated the following about Defendant Wentworth:

> Mr. Wentworth is an accomplished and respected leader with significant expertise in the payor and pharmacy space, as well as supply chain, information technology and human resources. The Board highly values his experience leading Evernorth Health Services and Express Scripts as the Company executes on its vision to be the leading partner in reimagining local healthcare and wellbeing for all.

### Defendant Mahajan

27.     Defendant Mahajan has served as the Company's EVP and Global CFO since March 1, 2024. Previously, Defendant Mahajan served as the Company's SVP and Interim Global CFO since July 2023 and as the Company's SVP, Global Controller and Chief Accounting Officer

---

[3] As Defendant Wentworth became CEO in October 2023, we do not have information regarding his compensation or beneficial stock ownership.

from July 2021 until July 2023. According to the Company's 2023 Proxy Statement, as of November 27, 2023, Defendant Mahajan beneficially owned 72,353 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on November 27, 2023 was $20.11, Defendant Mahajan owned approximately $1.5 million worth of WBA stock as of that date.

28.     For the 2023 Fiscal Year, Defendant Mahajan received $1,826,108 in total compensation from the Company. This included $790,833 in salary, $300,000 in bonus, $664,986 in stock awards, and $70,289 in all other compensation.

29.     The Company's website states the following about Defendant Mahajan:

Manmohan Mahajan is Executive Vice President and Global Chief Financial Officer (CFO) of Walgreens Boots Alliance, Inc. He served as interim global CFO since July 2023 and has played an integral role in leading WBA's growth and cost discipline efforts aimed at aligning the company's cost structure with business performance. This includes a focused approach to increasing cash flow across the company by lowering capital expenditures and keeping the company on pace toward $1 billion in cost savings this year.

Mahajan joined the company in 2016. As Senior Vice President, Global Controller and Chief Accounting Officer for WBA, he led global reporting, global finance systems and technical accounting teams, and also provided oversight to the controllership functions at Boots in the UK and Ireland, as well as Boots Opticians and International Retail.

Prior to joining WBA, Mahajan worked at GE Capital for 13 years in roles of increasing responsibilities, including Controller at GE Capital Americas and Assistant Global Controller at GE Capital Commercial Lending. Mahajan started his career in India within the public accounting sector, including PwC.

**Defendant Gates**

30.     Defendant Gates has served as the Company's SVP and CPO since March 2023. Previously, Defendant Gates served in various roles with the Company, beginning when he was employed as a pharmacist with the Company in May 1995.

31.     During the Relevant Period, while the Company's stock price was artificially

inflated and before the scheme was exposed, Defendant Gates made the following sale of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| November 10, 2023 | 1,000 | $20.45 | $20,450 |

Thus, in total, before the fraud was exposed, he sold 1,000 shares of Company stock on inside information, for which he received approximately $20,450 in proceeds. His insider sale, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

32.     The Company's website states the following about Defendant Gates:

Rick Gates is the Chief Pharmacy Officer at Walgreens, based in Deerfield, Ill. Pharmacy is the foundation of Walgreens business and critical to achieving the company's vision to reimagine local healthcare and wellbeing for all. As Chief Pharmacy Officer, Rick brings over 25 years of experience as a pharmacist at Walgreens to the organization's efforts to evolve the future of pharmacy in healthcare, broaden pharmacy services and oversees pharmacy operations. Rick also plays a key role in aligning and advancing the Walgreens pharmacy with the U.S. Healthcare division.

In his previous role, Rick served as senior vice president of pharmacy and healthcare, where he was responsible for commercial development and sales across health plans, pharmacy benefits managers, biopharmaceutical partnerships and work with health systems. This includes specialty pharmacy, clinical programs, contracting, pharmacy supply chain and alliances.

He has served in roles of increasing responsibility since joining Walgreens in 1995 after graduation from pharmacy school. Some key examples of roles include in store care delivery, field leadership, Duane Reade pharmacy integration lead and pharmacy operations where he led the strategic development, alignment and delivery of pharmacy-led health and wellness programs.

Rick serves as a current board member with the National Association of Chain Drug Stores (NACDS), Center for American Medicine Independence (Center for AMI), iA Rx and Pharmacy Quality Alliance (PQA) and is the executive lead for the Latino Professional Network (LPN) business resource group at Walgreens Boots Alliance, Inc.

Rick received a B.S. in pharmacy from the University of Iowa, where he was recognized in 2022 with the Distinguished Alumni Award. He is an active member of the American Pharmacist Association, NCPDP, NAS, the University of Iowa Alumni Association and an active member of the Health Evolution community.

**Defendant Babiak**

33.     Defendant Babiak has served as a Company director since April 2012. She also serves as Chair of the Audit Committee and as a member of the Finance and Technology Committee. According to the Company's 2023 Proxy Statement, as of November 27, 2023, Defendant Babiak beneficially owned 1,200 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on November 27, 2023 was $20.11, Defendant Babiak owned approximately $24,132 worth of WBA stock as of that date.

34.     For the 2023 Fiscal Year, Defendant Babiak received $325,000 in total compensation from the Company. This included $125,000 in fees earned or paid in cash and $200,000 in stock awards.

35.     The Company's 2023 Proxy Statement stated the following about Defendant Babiak:

Ms. Babiak is a U.S.-qualified Certified Public Accountant (CPA), Certified Information Systems Auditor (CISA), and Certified Information Security Manager (CISM). She is a Chartered Accountant (FCA) and a member of the Institute of Chartered Accountants in England and Wales (ICAEW), of which she served as a Council Member from 2011 until she reached the term limit in 2019.

Ms. Babiak brings to the Board her general management expertise and depth of experience in the areas of audit, accounting, and finance, through her prior experience as a Council Member of the ICAEW and as a managing partner at EY, including service as partner for a number of retail and healthcare-related industry clients. With her extensive accounting knowledge and experience, she is highly qualified to serve as the chair of the Audit Committee of the Board (the "Audit Committee") and as a member of the Finance and Technology Committee of the Board (the "Finance and Technology Committee"). Through her career experience and current CISM and CISA qualifications, she provides the Board with meaningful insight and knowledge related to information technology, cybersecurity best practices, and the relationship between information security programs and broader

11

business goals and objectives. Her international experience, leadership in the areas of climate change and sustainability, and experience working with and serving on the audit committees of other publicly traded companies further contribute to the perspective and judgment that she brings to service on the Board.

**Defendant Bhandari**

36.     Defendant Bhandari has served as a Company director since September 2022. He also serves as a member of the Finance and Technology Committee and the Nominating and Governance Committee.

37.     For the 2023 Fiscal Year, Defendant Bhandari received $115,293 in total compensation from the Company. This included $98,626 in fees earned or paid in cash and $16,667 in stock awards.

38.     The Company's 2023 Proxy Statement stated the following about Defendant Bhandari:

> With his deep experience as Chief Data Officer at multiple large companies, Mr. Bhandari provides the Board with strong technology experience coupled with business leadership and expertise. In addition, he brings to the Board insight and knowledge of specific healthcare technology matters given his extensive experience in the healthcare industry.

**Defendant Graham**

39.     Defendant Graham has served as a Company director since April 2010 and has served as the Company's Lead Independent Director since October 2022. She also serves as the Chair of the Nominating and Governance Committee and as a member of the Compensation and Leadership Performance Committee. Defendant Graham also briefly served as Interim CEO of the Company from September 1, 2023 until October 23, 2023. According to the Company's 2023 Proxy Statement, as of November 27, 2023, Defendant Graham beneficially owned 2,150 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on November 27, 2023 was $20.11, Defendant Graham owned

approximately $43,236 worth of WBA stock as of that date.

40.     For the 2023 Fiscal Year, Defendant Graham received $366,848 in total compensation from the Company. This included $166,848 in fees earned or paid in cash and $200,000 in stock awards.

41.     The Company's 2023 Proxy Statement stated the following about Defendant Graham:

> Ms. Graham brings to the Board her extensive experience in senior management and leadership roles in the healthcare industry, including experience leading companies in drug, device, and product development and commercialization. The Board values her insight and experience, including her service on the faculty of Harvard Business School where she taught classes in entrepreneurship. She also brings to her service on the Board valuable experience as a director of publicly and privately held life sciences companies and as a consultant to healthcare companies regarding strategy, leadership, team building, and capability building.

**Defendant Hanson**

42.     Defendant Hanson has served as a Company director since October 2022. He also serves as a member of the Compensation and Leadership Performance Committee and the Finance and Technology Committee. According to the Company's 2023 Proxy Statement, as of November 27, 2023, Defendant Hanson beneficially owned 9,694 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on November 27, 2023 was $20.11, Defendant Hanson owned approximately $194,946 worth of WBA stock as of that date.

43.     For the 2023 Fiscal Year, Defendant Hanson received $84,615 in total compensation from the Company, which consisted entirely of fees earned or paid in cash.

44.     The Company's 2023 Proxy Statement stated the following about Defendant Hanson:

> Mr. Hanson brings to the Board his extensive experience in the healthcare field. He

has significant experience in financial management, strategic planning, mergers and acquisitions, business integration, risk management and dealing with the regulatory aspects of the healthcare sector.

### Defendant Huffines

45.     Defendant Huffines has served as a Company director since January 2024.[4]

46.     The Company's 2023 Proxy Statement stated the following about Defendant Huffines:

> Mr. Huffines has more than 30 years of experience advising healthcare companies on strategy, mergers and acquisitions, divestitures and financing. The Board highly values his knowledge of, and experience in, the healthcare industry and the leadership skills and perspectives gained as an executive of one of the largest financial services firms in the world.

### Defendant Jarrett

47.     Defendant Jarrett has served as a Company director since October 2020. She also serves as a member of the Audit Committee and the Compensation and Leadership Performance Committee.

48.     For the 2023 Fiscal Year, Defendant Jarrett received $300,000 in total compensation from the Company. This included $100,000 in fees earned or paid in cash and $200,000 in stock awards.

49.     The Company's 2023 Proxy Statement stated the following about Defendant Jarrett:

> Ms. Jarrett brings to the Board her unique experience and expertise in governmental and public policy matters, including as a result of her service to a former President of the United States and in various positions with the City of Chicago, along with significant private sector experience. The Board also values her diverse perspectives as a business executive and civic leader, as well as an African American woman.

---

[4] As Defendant Huffines joined the Board in January 2024, the information regarding Defendant Huffines's compensation and beneficial stock ownership is not yet publicly available.

**Defendant Lederer**

50. Defendant Lederer has served as a Company director since April 2015. He also serves as the Interim Chair of the Finance and Technology Committee and as a member of the Compensation and Leadership Performance Committee and the Nominating and Governance Committee. According to the Company's 2023 Proxy Statement, as of November 27, 2023, Defendant Lederer beneficially owned 50,000 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on November 27, 2023 was $20.11, Defendant Lederer owned approximately $1 million worth of WBA stock as of that date.

51. For the 2023 Fiscal Year, Defendant Lederer received $315,000 in total compensation from the Company. This included $115,000 in fees earned or paid in cash and $200,000 in stock awards.

52. The Company's 2023 Proxy Statement stated the following about Defendant Lederer:

> Mr. Lederer brings to the Board significant management and business experience in the retail and healthcare industries as a result of his experience as Chief Executive Officer of a retail pharmacy. The Board values his understanding of the business operations of and issues facing large retail companies, including in the areas of marketing, merchandising, and supply chain logistics. Mr. Lederer also has extensive experience with respect to mergers and acquisitions and other corporate development activities. His prior and current service as a director of several public companies also provides him with insight into public company operations, including with respect to talent development, executive compensation, and succession planning.

**Defendant Pessina**

53. Defendant Pessina has served as a Company director since April 2012 and as Executive Chairman of the Board since March 2021. Defendant Pessina previously served as the Company's CEO from July 2015 until March 2021 and as Executive Vice Chairman from January

2015 until March 2021. According to the Company's 2023 Proxy Statement, as of November 27, 2023, Defendant Pessina beneficially owned 147,435,917 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on November 27, 2023 was $20.11, Defendant Pessina owned approximately $3 billion worth of WBA stock as of that date.

54.     For the 2023 Fiscal Year, Defendant Pessina received $7,573,960 in total compensation from the Company. This included $7,507,234 in stock awards and $66,726 in all other compensation.

55.     The Company's 2023 Proxy Statement stated the following about Defendant Pessina:

> As our Executive Chairman, Mr. Pessina leads our Board and brings an in-depth knowledge of the Company, including through his prior service as Chief Executive Officer of the Company and Executive Chairman of Alliance Boots, as well as in the retail and healthcare industries. His substantial international business experience and business acumen provide the Board with valued strategic, financial, and operational insights and perspectives. The Board also values Mr. Pessina's significant mergers and acquisitions experience as well as his experience serving on the boards of directors of numerous publicly and privately held healthcare and retail companies. He brings valued perspective and judgment to the Board's discussions regarding our competitive landscape and strategic opportunities and challenges.

**Defendant Polen**

56.     Defendant Polen has served as a Company director since July 2023. He also serves as a member of the Finance and Technology Committee. According to the Company's 2023 Proxy Statement, as of November 27, 2023, Defendant Polen beneficially owned 1,696 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on November 27, 2023 was $20.11, Defendant Polen owned approximately $34,106 worth of WBA stock as of that date.

57.     For the 2023 Fiscal Year, Defendant Polen received $14,130 in total compensation from the Company, which consisted entirely of fees earned or paid in cash.

58.     The Company's 2023 Proxy Statement stated the following about Defendant Polen:

Mr. Polen brings to the Board his extensive experience in the healthcare field. He has significant experience in innovation, financial management, strategic planning, mergers and acquisitions, business integration, risk management and regulatory aspects of the healthcare sector.

**Defendant Schlichting**

59.     Defendant Schlichting has served as a Company director since October 2006. She also serves as the Chair of the Compensation and Leadership Performance Committee and as a member of the Audit Committee. According to the Company's 2023 Proxy Statement, as of November 27, 2023, Defendant Schlichting beneficially owned 15,209 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on November 27, 2023 was $20.11, Defendant Schlichting owned approximately $305,853 worth of WBA stock as of that date.

60.     For the 2023 Fiscal Year, Defendant Schlichting received $319,974 in total compensation from the Company. This included $120,000 in fees earned or paid in cash and $199,974 in stock awards.

61.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Schlichting made the following sale of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| January 16, 2024 | 15,209 | $23.05 | $350,567 |

Thus, in total, before the fraud was exposed, she sold 15,209 shares of Company stock on inside

information, for which she received approximately $350,567 in proceeds. Her insider sale, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrates her motive in facilitating and participating in the scheme.

62.     The Company's 2023 Proxy Statement stated the following about Defendant Schlichting:

> As a result of her leadership of hospitals and health systems, Ms. Schlichting brings to her service on the Board a deep knowledge and understanding of the healthcare industry. The Board highly values her experience and insights gained at Henry Ford Health System, where she was responsible for the strategic and operational performance of a leading integrated health system, including an academic medical center, community hospitals, a health plan, a multi-specialty medical group, and an ambulatory and health retail network.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

63.     By reason of their positions as officers and/or directors of WBA and because of their ability to control the business and corporate affairs of WBA, the Individual Defendants owed WBA and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage WBA in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of WBA and its shareholders so as to benefit all shareholders equally.

64.     Each director and officer of the Company owes to WBA and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

65.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of WBA, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.

66.     To discharge their duties, the officers and directors of WBA were required to exercise reasonable and prudent supervision over the management, policies, controls, and

operations of the Company.

67. Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of WBA, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised WBA's Board at all relevant times.

68. As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

69. To discharge their duties, the officers and directors of WBA were required to

exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of WBA were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Illinois, and the United States, and pursuant to WBA's own Code of Conduct and Ethics;

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how WBA conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d) establish and maintain systematic and accurate records and reports of the business and internal affairs of WBA and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e) maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that WBA's operations would comply with all applicable laws and WBA's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f) exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the

Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

70.     Each of the Individual Defendants further owed to WBA and the shareholders the duty of loyalty requiring that each favor WBA's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

71.     At all times relevant hereto, the Individual Defendants were the agents of each other and of WBA and were at all times acting within the course and scope of such agency.

72.     Because of their advisory, executive, managerial, and directorial positions with WBA, each of the Individual Defendants had access to adverse, non-public information about the Company.

73.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by WBA.

## **CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

74.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further

aided and abetted and assisted each other in breaching their respective duties.

75.     The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, unjust enrichment, and violations of Sections 14(a), 10(b), and 20(a) of the Exchange Act.

76.     The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of WBA was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

77.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

78.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of WBA and was at all times acting within the course and scope of such agency.

### WBA'S CODE OF CONDUCT AND CORPORATE GOVERNANCE

***Code of Conduct and Ethics***

79.     The Company's Code of Conduct and Ethics (the "Code of Conduct"), "applies to:

WBA Board of Directors;" "WBA officers;" and "WBA team members."

80.     The Code of Conduct provides, in a section titled "We maintain accurate books and

records," that:

> Our books and records explain and document the financial and operational details, history and decisions of our business. Examples include invoices, expense reports, inventory and pricing data, contracts and regulatory filings.
>
> **Our commitment**
>
> We strive to keep complete and accurate company records that fairly reflect our business, and we submit timely reports to government regulators. We follow applicable laws, regulations, accounting standards and WBA Policies related to our records. We do not improperly alter or misrepresent records, regardless of how small the change or amount may be.
>
> **Why it matters**
>
> Maintaining the accuracy and integrity of our books and records builds trust with our shareholders, regulators and other stakeholders who rely on this information. Following company accounting and record-keeping policies supports our ability to run our business efficiently and demonstrates our commitment to integrity.
>
> **Keeping our commitment**
>
> - **Keep** complete and accurate records.
> - **Do not** improperly alter or destroy records.
> - **Report** irregularities and violations.
> - **Cooperate** with audits and investigations.
> - **Follow** Internal Controls and Records Management policies.

81.     The Code of Conduct provides, in a section titled "We comply with insider trading

laws," that:

> Insider trading occurs when someone illegally uses material, non-public information when trading in stock or other securities. "Material" means the information would be important to someone who is considering buying, selling or holding a stock or other security. "Non-public" means the information has not been shared widely with the public. Examples of material, non-public information include financial results, potential sales, mergers and acquisitions, significant contracts, major litigation and joint ventures.

Insider trading can also occur when someone discloses material, non-public information to others, including friends and family, to use for their own financial benefit. This is called tipping.

**Our commitment**

We do not trade on or improperly share material, non-public information. We follow insider trading and securities laws and regulations, and we handle material, non-public information in accordance with applicable requirements. We forbid insiders from using or disclosing material, non-public information for personal gain.

**Why it matters**

We uphold trust by operating honestly and fairly in the market. Insider trading is illegal and unethical, and it violates WBA Policies. Insider trading violations can result in termination of employment and civil and criminal penalties, including fines or even imprisonment. When we respect the rules of the market, we stand by our values and demonstrate our commitment to integrity.

**Keeping our commitment**

- **Comply** with WBA's Insider Trading Policy.
- **Keep** material, non-public information confidential.
- **Never** use material, non-public information for personal gain.
- **Ask** for guidance from the Legal department if you have questions.

82. The Code of Conduct provides, in a section titled "We communicate responsibly,"

that:

Communication is anything we, as a company, convey through spoken or written words or images. It includes internal emails, articles and anything we say publicly to investors, analysts, the media or on social media. Responsible communication aligns with our company culture, reflects our core values and follows our communication guidelines.

**Our commitment**

We are responsible and professional in how we communicate – internally and externally. We are mindful of our reputation, and we only allow authorized representatives to communicate externally on behalf of WBA. We require our team members to follow applicable WBA policies when representing us, including on social media. We understand when we may be seen as communicating on behalf of the company as opposed to as an individual, and we ask for guidance and approval

24

from Corporate Communications if we are unsure.

**Why it matters**

Our reputation influences behaviors and perceptions and is key to maintaining trust among our stakeholders, patients and customers. When we communicate responsibly with messages that are clear, transparent and consistent, this strengthens our reputation and builds trust in WBA.

**Keeping our commitment**

- **Communicate** responsibly, and keep in mind how our messages may be perceived.
- **Follow** applicable WBA policies for communication.
- **Direct** inquiries to authorized WBA representatives.
- **Protect** our company's reputation.

83.     Lastly, the Code of Conduct allows for waivers, stating:

The company may consider a request for a waiver of limited elements of our Code in rare circumstances. A request for a waiver must be submitted to the SVP, Global Chief Compliance and Ethics Officer. Any waiver for a director or an executive officer **_must be approved by the Board of Directors and will be disclosed to shareholders._** Any waiver requested by other team members may be subject to the approval of the General Counsel or the Chief Executive Officer.

***Corporate Governance Guidelines***

84.     The Company also maintains Corporate Governance Guidelines (the "Governance Guidelines") intended "to assist the Board in the exercise of its responsibilities on behalf of the Company and its stockholders."

85.     In a section titled "Board Responsibilities," the Governance Guidelines state, in relevant part:

c)  Overseeing the conduct of the Company's business and strategic plans to evaluate whether the business is being properly managed;

d)  Reviewing an approving the Company's financial objectives and major corporate plans and actions;

e)  Overseeing the Company's audit and disclosure of the Company's financial performance (including oversight of internal and external audit processes

25

and selection of the independent auditor);

    f)    Overseeing the Company's risk management policies and processes designed to promote ethical conduct and legal compliance and the Company's compliance with applicable laws and regulations.

86.    In a section titled "Ethics and Code of Conduct," the Governance Guidelines state that:

> The Board expects directors to act ethically at all times and to adhere to the Company's Code of Conduct and Business Ethics and other applicable policies. The Board shall periodically review and approve and shall oversee compliance with the Company's Code of Conduct and Ethics. Any waiver for a director or an executive officer of the Code of Conduct and Ethics must be approved by the Board of Directors and will be disclosed to stockholders.

87.    In a section titled "Oversight of Strategic Plans and Enterprise Risk Management," the Governance Guidelines state that:

> Management of the Company bears primary responsibility for developing and implementing strategic plans. The Board reviews strategic plans annually with those members of management having responsibility for their development and execution and approves changes to the strategic plans. Similarly, management of the Company is primarily responsible for establishing and maintaining systems to manage risk. The Board and its committees exercise oversight of the enterprise risk management of the Company.

88.    In violation of the Code of Conduct and Governance Guidelines, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of Sections 14(a), 10(b), and 20(a) of the Exchange Act. Moreover, two of the Individual Defendants violated the Code of Conduct by engaging in insider trading. Additionally, in violation of the Code of Conduct, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical

manner, and properly report violations of the Code of Conduct.

## WBA'S AUDIT COMMITTEE CHARTER

89.     The Company's Audit Committee Charter states that the Audit Committee was:

[E]stablished . . . to assist the Board in its oversight of (1) the integrity of the Company's financial statements and its accounting and financial reporting process; (2) the soundness of the Company's systems of internal accounting and financial controls; (3) the annual independent audit of the Company's financial statements; (4) the independent auditor's qualifications, performance and independence; (5) the Company's compliance with legal and regulatory requirements; and (6) the performance of the Company's independent auditor and internal audit function.

90.     The Audit Committee Charter outlines the special duties of the Audit Committee,

which include, among other things:

1.  Review of Quarterly and Annual Financial Statements. Review and discuss with management and the independent auditor the Company's annual audited financial statements and unaudited quarterly financial statements, including any critical audit matters and disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" prior to filing with the SEC or distribution to stockholders and the public.

2.  Report from the Independent Auditors. Request that the independent auditor report on matters required to be communicated to the Committee in accordance with applicable auditing standards established from time to time by the PCAOB or SEC rules and regulations, including the matters required to be discussed by Auditing Standard No. 1301, "Communications with Audit Committees" (as such standard may be further modified or supplemented from time to time) and under Section 10A(k) of the Exchange Act and Rule 2-07 of Regulation S-X under the Exchange Act.

3.  Certifications. Review any disclosures made by the Company's Chief Executive Officer and Chief Financial Officer during their certification process for the Form 10-K and Form 10-Q about any significant deficiencies in the design or operation of internal controls, or material weaknesses therein, and any fraud involving management or other employees who have a significant role in the Company's internal controls

* * *

5.  Review of Earnings Releases. Discuss with management the Company's earnings press releases, including the use of "adjusted" non-GAAP information, as well as financial information and earnings guidance provided to analysts and rating agencies. Such discussion may be general

(consisting of discussing the types of information to be disclosed and the types of presentations to be made).

* * *

7. <u>Audit Services</u>. Review with the independent auditor and the General Auditor their annual audit plans to determine the combined audit coverage for the Company, and approve their respective audit plans.

8. <u>Risk Assessment and Risk Management</u>. Regularly review and discuss with management, no less than annually, the Company's enterprise risk assessment and key enterprise risks, including major litigation and financial risks, as well as information security and technology risks, including cybersecurity and risks related to climate change, sustainability and other environmental, social and governance-related matters. Periodically review the steps management has taken to monitor and control such risk exposures, including the risk assessment and risk management policies and procedures.

* * *

10. <u>Legal and Compliance</u>. Periodically meet with the Company's Chief Legal Officer and Chief Compliance Officer, or other senior members of the Company's legal and compliance departments, and discuss any significant legal, compliance, or regulatory matters that may have a material impact on the Company's business, financial statements, or compliance policies. At least annually, review the overall adequacy and effectiveness of the Company's legal and compliance programs.

* * *

13. Engagement and Oversight of Independent Auditor. Directly appoint, retain, compensate (including approval of the terms of engagement) and terminate (when circumstances warrant) the Company's independent auditor, which will report directly to the Committee. The Committee shall exercise oversight of the independent auditor, including resolution of disagreements between management and the independent auditor.

* * *

16. <u>Disclosure Controls and Procedures and Internal Control Over Financial Reporting</u>. Periodically review the adequacy and effectiveness of the Company's disclosure controls and procedures and the Company's internal controls over financial reporting, including any significant deficiencies or material weaknesses and significant changes in internal controls.

91.     In violation of the Audit Committee Charter, Defendants Babiak, Jarrett, and Schlichting conducted little, if any, oversight of the Company's engagement in the Individual

Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of Sections 14(a), 10(b), and 20(a) of the Exchange Act. Moreover, in violation of the Audit Committee Charter, Defendants Babiak, Jarrett, and Schlichting failed to maintain the accuracy of Company records and reports, comply with laws and regulations, act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

## **INDIVIDUAL DEFENDANTS' MISCONDUCT**

### **Background**

92.     Touting a 170-year history, WBA is a Delaware corporation headquartered in Illinois that provides customers and patients with healthcare through its retail store and pharmacy locations.

93.     WBA is one of the largest retail pharmacy, health, and daily living corporations within the United States and Europe. WBA provides pharmaceutical, retail, and healthcare services to customers through its over 13,000 stores that are found in 9 countries spread throughout the United States, Europe, and Latin America.

94.     WBA's stores include brands such as its Walgreens, Boots, Duane Reade, Benavides, and Ahumada drugstores.

95.     WBA further reaches customers through its product brands such as No7, Soap and Glory, Free and Pure, NICE!, Liz Earle, Botanics, Sleek MakeUP, and YourGoodSkin.

96.     WBA's business is split into three distinct categories: retail and pharmacy within the United States, international sales, and United States healthcare.

97.     During the Relevant Period, Defendants publicly overstated the WBA's expected

revenue for the 2024 Fiscal Year by exuding confidence in the Company's pharmacy division's brand inflation, volume growth, cost execution, and discipline, as well as the pharmacy division's overall contributions to the Company.

98.     Also during the Relevant Period, WBA's Board facilitated an immense share repurchase program. In October 2023, the Company repurchased approximately 3.1 million shares of WBA common stock, costing the Company over $69.3 million.

**<u>False and Misleading Statements</u>**

***October 12, 2023 Press Release***

99.     On October 12, 2023, the Company published the FY 2023 Press Release announcing the year-end financial results for the 2023 Fiscal Year and guidance for the upcoming 2024 Fiscal Year.

100.     The guidance for the 2024 Fiscal Year revealed optimistic growth. Specifically, the FY 2023 Press Release revealed an expected "adjusted EPS of $3.20 to $3.50, with underlying earnings growth more than offset by lower sale and leaseback contribution, a higher tax rate, and lower COVID-19 contribution."

101.     The FY 2023 Press Release further revealed an anticipated "U.S. Healthcare adjusted EBITDA to be breakeven at the midpoint of the guidance range of ($50) to $50 million."

***October 12, 2023 Earnings Call***

102.     That same day, Defendants held the FY 2023 Earnings Call with analysts and investors to discuss the fiscal results and guidance for the upcoming year. In discussing the Company's retail pharmacy segment, Defendant Mahajan stated "we expect U.S. retail pharmacy underlying adjusted operating ***income to be driven by immediate actions to improve the cost base and modest underlying growth in both retail and pharmacy***."

103.     Defendant Mahajan later elaborated on the Company's expected growth for the upcoming 2024 Fiscal Year despite negative impacts on the adjusted operating income ("AOI"). Specifically, Defendant Mahajan stated:

> **U.S. Retail Pharmacy segment sales are projected to be flat to up 2%**. AOI will be negatively impacted by approximately 8 percentage points from the lower COVID-19 contributions and roughly 11 percentage points of lower sale and leaseback gains. **Excluding these impacts, the underlying business is projected to drive 5% to 10% AOI growth**.

104.     Defendant Mahajan then identified what the Company anticipated its "key business drivers" for this growth to be, stating:

> First, we anticipate script volume growth driven by overall market growth. On reimbursement, we have roughly 75% of the contract signed for calendar year '24. **We do expect reimbursement pressure to be less of a headwind in fiscal '24 than in fiscal '23**.
>
> We're projecting approximately 5 million COVID vaccinations in 2024. Quarter-to-date, we're well on track and have already administered over 3 million COVID vaccinations. **In retail, we expect margins to benefit from our category performance improvement program and a roughly 1 percentage point increase in own brand penetration**.

105.     Despite these optimistic assertions, Defendant Mahajan also prefaced that Defendants were aware of potential headwinds in the pharmacy category that could have a negative impact overall, stating:

> At the same time, **we're adopting a prudent approach. We see a continuation of the challenging trends that impacted the second half of fiscal 2023**. **We're projecting flat comparable sales due to a milder cough, cold, and flu season year-on-year, lower COVID OTC test kit volume and continued consumer pressure.** We're also planning a higher level of shrink, which has been increasing in the last several months and continues to represent a serious systemic issue across the retail industry. Within SG&A, we expect to achieve over $1 billion of cost savings during fiscal 2024, as Ginger has already described.

106.     In looking towards the later quarters of the 2024 Fiscal Year, Defendant Mahajan described the Company's strategy as the following:

*Moving beyond the first quarter, we will see sequential improvement,* and I will discuss the top 4 drivers. First, we're executing a series of actions to lower our *cost base*. These will have limited impact on the first quarter, but *will start to ramp in the second quarter*. There is adjusted EPS benefit of $0.50 to $0.60 in the balance of the year compared to the first quarter.

Second, in our U.S. Healthcare segment, we expect profitability to improve from optimizing the clinic footprint, growing patient panels and realigning costs. *Third, we expect growing contributions from retail initiatives, including sequentially improving retail comps and margin expansion programs.* Finally, seasonality plays a role in our business, benefiting the second quarter, which is usually the height of the cough, cold, flu season in the U.S. and is when Boots U.K. sees significant profit driven by the holiday season.

107. During the question and answer portion later in the call, a JP Morgan analyst asked about cost-cutting measures enacted by the Company in the retail pharmacy category. The question specifically addressed the expectation of scripts (excluding respiratory scripts).

<Q: Lisa Christine Gill – JPMorgan Chase & Co – Analyst> And then just as it ties into kind of what everybody is talking about on the retail side, right, and I know you've given some guidance there. But as we think about expectation of scripts coming down, I would think that maybe there's an opportunity for more scripts to be pulled through into Walgreens.

I understand respiratory, et cetera. But maybe if somebody can comment, Rick, if Rick is on the call, how do you think about that pull-through and opportunity on the scripts, excluding what we're seeing on the respiratory side?

I know that the talk was 75% of relationships are signed on reimbursement, but reimbursement is expected to be down. Like what are going to be some of the big drivers beyond the $1 billion of incremental cost saves that we can actually see drive the operating profit in your core pharmacy business?

108. In response, Defendant Gates stated:

I'll kind of give the building blocks to script growth that we're expecting this year. Obviously, we saw a weaker end of the fiscal year from market growth, specifically around cough, cold, flu, some of the respiratory and some of the Medicaid redetermination, which shows some lower utilization from consumers.

*So the primary driver of the market coming back in line with what the expectations are from IQVIA and others*. And so that's really what we've seen as we started into the first quarter of the fiscal year, and market is going to be a big underpinning to what we do. But *we continue to advance our adherence programs that are really driving incremental script growth,* partnering with health plans and

others to really drive better adherence. And obviously, that does help on the script side.

109. Defendant Gates also identified additional plans that the Company purportedly intended to take, stating:

> You're also going to see some access initiatives, especially going into calendar year '24, which should be some tailwinds for us. I think some changing dynamics in the marketplace or having individuals choose more open access and things that should give us access differently than what we've seen in the past. And the last one would be that we're really focused on potential profile buys and opportunities given some of the changes in the marketplace.
>
> **So I think there's a bunch of drivers that really give us confidence that we have tailwinds behind us in the script growth**.

110. Later in the call, an analyst from Deutsche Bank asked about the rationale behind where the relevant cuts are coming from, specifically asking:

> This is kind of a two-parted question that go together. I guess can you talk about -- if we think about the segments, how we should look at apportioning the $1 billion in cost savings and kind of the other side of that is the cut in CapEx seems pretty severe. It's taking $0.5 billion or so out on a sub-$2 billion number.
>
> How should we think about from a segment perspective, kind of where the CapEx cuts are coming from? And kind of how they're being apportioned? And I don't know if you can kind of give any examples specifically of the bigger sources of cost-cutting savings or the bigger sources of CapEx savings?

111. In response to the cost savings portion of the question, Defendant Mahajan responded:

> So let me start with the cost savings. We're expecting at least $1 billion of cost savings. **And I think the way you need to think about this is majority of this is going to be coming from our U.S. retail pharmacy business**.
>
> And three or four components, let me just walk through them real quick. Ginger talked about we're looking at all costs related to headquarter support office, and we're going line by line. So that's one. We are closing unprofitable locations, and that's going to be accretive in the year.
>
> We have optimized store hours in certain locations to match with where the local market already is. And I think the other big component of this is we've looked at

all the project spend and all the projects that exist across the company. And I think the focus is there twofold. More importantly, it's how do we focus the organization on customer-focused initiatives so that we deliver more value. But then obviously, reducing the spend on the income statement. So that's on the cost side.

112. Further, in response to the question regarding CapEx, Defendant Mahajan explained:

Look, on the CapEx side, I'd say if you look at the trend we've seen, you go back to maybe fiscal '22, I think we were at around $1.4 billion in the year. We increased to -- this is '21, sorry. And then we went up $300 million. And again, last year was the peak of $2.1 billion. And so what we're trying to achieve here is getting back to kind of the normal levels of CapEx here. ***Two parts that are going to contribute into this again is, one, as John talked about, we're very focused in our Healthcare segment on profitable growth. And so we will see a lower level of CapEx or growth CapEx coming out from U.S. Healthcare segment***.

***And then if you look at a couple of drivers of the CapEx on the U.S. retail pharmacy, micro fulfillment centers as well as our digital transformation, some of those things are coming to fruition***. And Ginger talked about taking a pause on micro fulfillment center so that we increase the productivity and achieve the desired results there first. So those are some of the factors, high level that are driving the CapEx reduction.

### *2023 Proxy Statement*

113. On December 8, 2023, the Company filed the 2023 Proxy Statement with the SEC. Defendants Babiak, Bhandari, Graham, Hanson, Jarrett, Lederer, Pessina, Polen, Schlichting, and Wentworth solicited the 2023 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

114. The 2023 Proxy Statement called for Company shareholders to vote to: (1) elect Defendants Babiak, Bhandari, Graham, Hanson, Huffines, Jarrett, Lederer, Pessina, Polen, Schlichting, and Wentworth to the Board; (2) ratify the appointment of Deloitte and Touche LLP as the Company's independent registered public accounting firm for the 2024 Fiscal Year; (3) approve named executive officer compensation on an advisory, non-binding basis; and (4) approve the frequency of future say-on-pay voting on an advisory, non-binding basis.

115.    Regarding the Company's Code of Conduct, the 2023 Proxy Statement provided, in relevant part:

> We have adopted a Code of Conduct and Ethics that applies to all of our employees, officers and directors and that the Board, through the Nominating and Governance Committee, reviews annually. We have also adopted a Code of Ethics for our CEO and Financial Executives that applies to and has been signed by our CEO, Interim Global Chief Financial Officer, Interim Global Controller and Chief Accounting Officer and other senior financial officers. These policies can be found at https://investor.walgreensbootsalliance.com/governance.

> We intend to promptly disclose on our website, in accordance with applicable rules, any required disclosure of changes to or waivers, if any, of our Code of Conduct and Ethics or our Code of Ethics for our CEO and Financial Executives.

116.    Regarding the Board's "Role in Risk Oversight," the 2023 Proxy Statement provided, in relevant part:

> We face a broad array of risks, including market, operational, strategic, legal, regulatory, reputational, cybersecurity/data security, environmental, social and financial risks. Our management is responsible for establishing and maintaining systems to manage these risks. The Board exercises oversight over the elements and dimensions of major risks that we face. The Board administers its risk oversight function as a whole and through its Committees.

> We have established a global enterprise risk management ("ERM") program, which is led by our Global Chief Compliance and Ethics Officer ("Chief Compliance Officer"). Our Chief Compliance Officer has a dual reporting line to the Chair of the Audit Committee and the Company's Global Chief Legal Officer. Our Governance, Risk and Compliance ("GRC") committee, which is composed of key members of senior management, oversees and monitors the activities of our ERM program and reviews, on a regular basis, the top current and emerging enterprise risks we face, as well as relevant risk mitigation activities. Since the strategic combination of Walgreens and Alliance Boots in 2014, the Company has regularly enhanced the overall ERM program and expanded its scope to align with the Company's business. Currently, in addition to the executive-level enterprise-wide GRC committee, the Company has established similar GRC committees within each of its three business segments. In addition, risk assessments are created by each business unit and consolidated into segment and Company-level risk assessments and mitigation plans. Our ERM leader meets regularly with senior members of the Company's global leadership team and other members of the Company's oversight and support functions and specific risk owners to help ensure the latest insights and mitigation are incorporated into the Company's risk register.

This global ERM approach helps the Board and its Committees receive relevant information about risks and understand our risk management process, the participants in the process, and key information gathered through the process.

The purpose of the ERM process is to identify risks that could affect us and the achievement of our objectives; to understand, assess, and prioritize those risks; to communicate identified events and risks quickly and effectively to necessary parties across the Company; and to facilitate the implementation of risk management strategies and processes across the Company.

117. Defendants Babiak, Bhandari, Graham, Hanson, Jarrett, Lederer, Pessina, Polen, Schlichting, and Wentworth caused the 2023 Proxy Statement to be false and misleading by failing to disclose that: (1) WBA did not have sufficient or effective risk management or compliance controls and procedures; (2) as a result, WBA overemphasized confidence in the pharmacy division's ability to carry the Company; (3) this confidence was misplaced as the pharmacy division was not actually equipped to adapt to ongoing hurdles within the industry; (4) as a result, WBA must undergo significant restructuring in order to create a sustainable model; (5) as a result of withholding this information, shares of the Company's stock were valued at artificially inflated prices; and (6) once these failures were disclosed, the Company would be subjected to financial risk, enhanced regulatory oversight, and reputational harm. As a result of the foregoing, statements about the Company's business, operations and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

118. The 2023 Proxy Statement was also false and misleading because, despite assertions to the contrary, its Code of Conduct was not followed, as the Individual Defendants violated the Code of Conduct, including by allowing false and misleading statements to be issued to the investing public.

119. As a result of Defendants Babiak, Bhandari, Graham, Hanson, Jarrett, Lederer, Pessina, Polen, Schlichting, and Wentworth causing the 2023 Proxy Statement to be false and

misleading, Company shareholders voted, *inter alia*, to: (1) reelect Defendants Babiak, Bhandari, Graham, Hanson, Jarrett, Lederer, Pessina, Polen, Schlichting, and Wentworth to the Board, as well as elect Defendant Huffines to the Board for the first time, allowing them to continue to breach their fiduciary duties to the Company; (2) ratify Deloitte and Touche LLP as the Company's independent registered public accounting firm for the 2024 Fiscal Year; (3) approve named executive officer compensation on an advisory, non-binding basis; and (4) approve one year as the frequency of future say-on-pay voting on an advisory, non-binding basis.

### *January 4, 2024 Press Release*

120. On January 4, 2024, the Company published a press release (the "1Q 2024 Press Release"), announcing its financial results for the first quarter of the 2024 Fiscal Year as well as providing updated guidance for the remaining quarters of the 2024 Fiscal Year.

121. The 1Q 2024 Press Release revealed generally positive results. Regarding loss per share in the first quarter, the 1Q 2024 Press Release revealed:

> First quarter loss per share was $0.08 compared to a loss per share of $4.31 in the year-ago quarter; first quarter results included $278 million after-tax charge for fair value adjustments on variable prepaid forward derivatives related to the monetization of Cencora shares.

122. Regarding adjusted earnings per share, the 1Q 2024 Press Release revealed a decrease of "43.1 percent to $0.66, ***down 43.7 percent on a constant currency basis reflecting challenging retail market trends in the U.S. and a 21 percentage point headwind from a higher tax rate***."

123. Regarding sales numbers in the first quarter, the 1Q 2024 Press Release revealed that "sales increased 10.0 percent year-over-year to $36.7 billion, up 8.7 percent on a constant currency basis."

124. Regarding the quarterly dividend payment, the 1Q 2024 Press Release revealed that

there would be "a 48 percent reduction in quarterly dividend payment to $0.25 per share."

125. When turning to the guidance for the remainder of the 2024 Fiscal Year, the guidance remained unchanged from the FY 2023 Press Release, with the 1Q 2024 Press Release revealing an expected "adjusted EPS of $3.20 to $3.50, with underlying earnings growth more than offset by lower sale and leaseback contribution, a higher tax rate, and lower COVID-19 contribution."

126. Similarly, the adjusted EBITDA expectation was unchanged, with the 1Q 2024 Press Release revealing, with regard to the 2024 Fiscal Year guidance, "Maintaining U.S. Healthcare adjusted EBITDA to be breakeven at the midpoint of the guidance range of ($50) to $50 million."

*January 4, 2024 Earnings Call*

127. On an earnings conference call Walgreens hosted that same day (the "1Q 2024 Earnings Call"), Defendants discussed the Company's first quarter results. Acknowledging the weak environment in the industry, Defendant Wentworth discussed the results with optimism, stating:

> As you are by now aware, WBA started fiscal 2024 with on-plan results despite a weak retail environment in the U.S. First quarter adjusted EPS came in at $0.66, reflecting execution and cost discipline in U.S. Retail Pharmacy, continued strong performance in International and progress with profitability initiatives in U.S. Healthcare. ***We are maintaining full year adjusted EPS guidance against a challenging backdrop.*** I must give credit here to the hard work and dedication of our teams. ***We are navigating the accumulating consumer pressures from inflation and depleted savings and somewhat slower-than-anticipated market trends in pharmacy script volumes, including impacts from a weaker respiratory season and Medicaid redetermination***.

128. In his acknowledgment of the challenges faced in the first quarter, Defendant Wentworth continued to identify bright spots that would reduce any need for concern, identifying:

> Retail customers in the United States are under stress and making deliberate choices

to seek value, *evidenced in our own brands up 90 basis points in the quarter*, while demand for seasonal and discretionary categories remains weak.

At the same time, *our teams executed well during the quarter on delivering pharmacy services, including vaccines and maintaining our overall share of script volume in the U.S. International was once again a bright spot in the quarter, building on last year's solid growth*. Upside was led by Boots U.K. with further share gains in retail, while both retail and pharmacy delivered gross profit improvement despite inflationary cost pressures. Germany also achieved share gains.

129.    In discussing the macroeconomic headwinds that the Company faced in the first quarter, Defendant Wentworth went on to discuss the following, in relevant part:

So macroeconomic conditions are clearly difficult for retailers, and *I fully acknowledge the structural headwinds in our core pharmacy business and the growing pains in our Healthcare segment*. None of this is a surprise to me. I came to WBA eyes wide open with a clear mandate to act with everything on the table in terms of putting our business on the right track.

In that context, we are taking swift actions to rightsize costs and increase cash flow across the company. *We remain on pace toward $1 billion in cost savings this year*. Our U.S. organizational efforts have resulted in a planned headquarter support office workforce reduction of approximately 20%. Over the past 2 months, we have prioritized projects and capital spend to focus on the customer-facing activities that matter most.

130.    Defendant Wentworth then went on to discuss improvements the Company was attempting to make to the pharmacy division. Specifically, he identified ways to increase productivity, stating:

We are enabling pharmacists to spend less time on tasks and more time on meaningful interactions and providing essential care, from health screenings to immunizations to diagnostic testing and treatment. *Our network of micro fulfillment centers is helping to stabilize staffing and pharmacy hours, reduce workflow pain points and free up capacity to drive the outcomes that matter most to our patients and partners*.

You'll remember in October we mentioned a pause in the rollout to optimize productivity. *We are happy with our continued progress and the importance of these centers in our overall strategy*. We are also piloting virtual pharmacy to redefine connected care, further increase patient access, enhance workplace flexibility, and extend our pharmacist reach.

131.    Defendant Wentworth also highlighted the Company's recent recruitment efforts, stating:

> Finally, we are partnering with academia, and specifically, key schools of pharmacy to explore ways to attract, recruit and create a dynamic workplace for the next generation of pharmacists. Our relationships with pharmacy deans are integral to our strategy and can help us advance the profession, and so we are forming an advisory council to guide us in our transformation. I look forward to personally working with the deans with our first meeting in March to ensure Walgreens is the preferred employer in the pharmacy space. And I want to thank our pharmacy teams for their tireless efforts on the front lines of health care delivery in this country.

132.    Later in the call, Defendant Mahajan continued to praise the pharmacy department's improvement, stating:

> AOI declined 37.2% year-on-year, mainly driven by lower retail sales volume and margin, including higher levels of shrink. ***AOI was positively impacted by execution in our pharmacy services and progress on cost savings initiatives***.
>
> Let me now turn to U.S. Pharmacy. ***Pharmacy comp sales increased 13.1%, mainly driven by brand inflation and higher contribution from pharmacy services***. COVID-19 vaccines have now shifted to a commercial model consistent with other vaccinations. Comp scripts grew 1.8%, excluding immunizations, in line with the overall prescription market.

133.    Defendant Mahajan then turned to the Company's United States retail division. Defendant Mahajan acknowledged that there were "[c]hallenging macroeconomic conditions and an anticipated slow start to the cough, cold, flu season [which] contributed to a weaker retail performance year-on-year. Comparable sales declined 5% in the quarter."

134.    In describing the negative sales in the retail division, Defendant Mahajan identified:

> There are 3 main drivers. First, ***a weaker respiratory season had an impact of approximately 160 basis points through the health and wellness category***. Cough, cold, flu serves as a primary trip driver. As a result, we also experienced lower attachment sales due to the weaker season, which are incremental to the 160 basis points impact. Second, ***customers continue to pull back on discretionary spending, and actively seek out promotional opportunities***. As a result, we saw an approximately 90 basis points impact from weaker holiday seasonal sales. Lastly, ***our decision to close most of our stores on Thanksgiving this year to further***

***support our store team members led to a headwind of about 60 basis points***.

135.    Defendant Mahajan identified that the most heavily impacted areas occurred in "consumables and general merchandise and in health and wellness." Generally, "[r]etail gross margin was negatively impacted by 110 basis points due to higher shrink. Retail shrink continues to be a systemic issue across the retail industry."

136.    Turning his attention to the predictions for the remainder of the 2024 Fiscal Year, Defendant Mahajan stated that "[w]e are maintaining our fiscal '24 adjusted EPS guidance" and that "[w]e expect certain incremental tailwinds and headwinds in a challenging environment compared to our prior outlook."

137.    Expanding on the nature of those "tailwinds," Defendant Mahajan explained:

> ***On the tailwinds, with strong execution to date, we now expect pharmacy services to deliver ahead of our initial plan.*** We also anticipate an improvement in our full year adjusted effective tax rate as a result of tax planning initiatives, with a revised range of 15% to 17%, compared to the prior outlook of 19% to 20%.

138.    When discussing the nature of the aforementioned "headwinds," Defendant Mahajan stated:

> On the headwinds. ***First, we expect the pullback in consumer spending and shifting behaviors will continue to impact our retail sales in the U.S. in the short term, while improving in the second half***. We now expect retail comp sales for fiscal '24 to decline low single digits compared to the prior outlook of flat. Second, we expect approximately $125 million in reduced sale and leaseback gains versus our prior outlook. As we explained in October, this is the last year of anticipated sale leaseback transactions. ***Lastly, we also forecast slightly lower overall market volume growth for prescriptions compared to our previous expectations.***

139.    Defendant Mahajan then continued to explain the key drivers for the Company's "improving earnings profile" when evaluating the second half of the 2024 Fiscal Year. In so doing, Defendant Mahajan stated the following, in relevant part:

> Looking ahead to the second half of fiscal '24, there are 4 key drivers for our improving earnings profile. First, as we have previously discussed, we expect

actions to lower our cost base will continue to ramp over the year. Second, *we expect U.S. Healthcare segment profitability will scale over the balance of the year*, mainly driven by benefits from optimizing the clinic footprint, growing patient panels and realigning cost at VillageMD, and growth across all of the businesses.

*Third, we cautiously expect modest level of retail market growth against an easier second half comparison.* Finally, our tax rate was elevated in the first quarter. We expect favorability in the remainder of the year.

### March 28, 2024 Press Release

140.    On March 28, 2024, the Company published a press release (the "2Q 2024 Press Release"), announcing its financial results for the second quarter of the 2024 Fiscal Year and providing updated guidance for the remaining quarters of the 2024 Fiscal Year.

141.    In discussing the financial results for the second quarter, the 2Q 2024 Press Release was generally positive. The 2Q 2024 Press Release identified a 3.4% increase in adjusted EPS, as well as a 6.3% increase in sales year-over-year.

142.    Turning towards the predicted guidance for the remainder of the 2024 Fiscal Year, the 2Q 2024 Press Release narrowed the adjusted EPS guidance by lowering the upper limit, stating:

> Narrowing fiscal 2024 adjusted EPS guidance to $3.20 to $3.35, reflecting challenging retail environment in the U.S., early wind-down of sale-leaseback program, and lower earnings due to Cencora share sales, offset by execution in pharmacy services and a lower adjusted effective tax rate.

143.    Despite this, Defendants continued to be optimistic in their projections, with the 2Q 2024 Press Release quoting Defendant Wentworth as stating that the Company "remain[s] confident in our goal of achieving $1 billion in cost savings this year. *We are continuing to strategically review our portfolio over the next three months in an effort to ensure it drives growth and delivers value*."

### March 28, 2024 Earnings Call

42

144.    On an earnings conference call that same day (the "2Q 2024 Earnings Call"), Defendants discussed the second quarter results with analysts and investors. In discussing the second quarter results in comparison to the Company's expectations, Defendant Wentworth stated

> WBA's second quarter operational results were in line with our expectations despite continued challenges in the U.S. retail environment. ***Adjusted EPS of $1.20 reflects good execution and cost discipline in our U.S. Retail Pharmacy segment***, continued strong performance in International, our first quarter of positive adjusted EBITDA in U.S. Healthcare and positive impacts from tax planning benefits.

145.    Moving on to the guidance for the remaining quarters of the 2024 Fiscal Year, Defendant Wentworth explained:

> We are narrowing full year adjusted EPS guidance to a range of $3.20 to $3.35. ***This guidance reflects a challenging retail environment in the U.S.*** and our decisions to both wind down the sale-leaseback program and to sell additional shares of Cencora in a further effort to simplify our financial reporting.

146.    In discussing the plans for the upcoming third quarter, Defendant Wentworth announced:

> Over the next 3 months, we will continue the intense review of our portfolio of assets in an effort to ensure that each contributes to the growth we aspire to deliver and drives our go-forward strategy to be the leading retail pharmacy and health services partner that creates deep relationships and trust.
>
> Let me share further detail on the progress happening across our businesses to date. ***In our U.S. Retail Pharmacy business, we are navigating a challenging backdrop and exploring innovative pathways to boost profitability and growth***. Within retail, our U.S. customer is confronting considerable pressure from multiyear inflationary trends and depleted household savings with U.S. household debt at record levels and delinquency rates on the rise.

147.    Lastly, Defendant Wentworth turned to the pharmacy division by following up on a number of the initiatives he had discussed in the 1Q 2024 Earnings Call, announcing:

> ***We delivered another quarter of strong execution with outperformance in pharmacy services led by our vaccines portfolio***. While market growth was slower than originally anticipated, we maintained market share. Our 11 micro fulfillment centers currently support 4,600 stores, which is over half our footprint. Earlier this year, we talked about pausing the rollout of additional micro-fulfillment centers as

we work to optimize the model that gives our pharmacists and technicians the ability to spend more time on customer-facing activities and less time on core dispensing.

We're seeing benefits such as improved NPS scores, patient retention and adherence . . . earlier this month, we kicked off our first Dean's Advisory Council meeting with the mission of reenergizing and evolving the definition of community pharmacy as demand for pharmacy services increases while the industry faces a pronounced labor shortage. We are on a mission to achieve provider status for our pharmacists given their influence which was so clearly highlighted during the pandemic.

148.    Defendant Mahajan then took over to continue elaborating on the Company's

pharmacy division, stating:

Let me now turn to U.S. pharmacy. ***Pharmacy comp sales increased 8.7%, mainly driven by brand inflation, volume growth and contribution from pharmacy services***. Comp scripts grew 2.9%, excluding immunizations, in line with the overall prescription market. The ongoing impact of Medicaid redeterminations continued to negatively impact overall market growth.

***Pharmacy Services performed better than expectations, driven by our vaccines portfolio.*** Pharmacy adjusted gross profit was down slightly versus the prior year quarter with margin negatively impacted by brand mix impacts and reimbursement pressure net of procurement savings.

149.    Turning to the Company's U.S. retail division, Defendant Mahajan identified that

there was a 4.3% decline in sales in the second quarter, citing "a challenging retail environment

with a shift in discretionary spend away from the drug channel as consumers seek value."

Defendant Mahajan stated the following with respect to this shift:

There were 3 main drivers. First, as consumers continue to pull back on discretionary spending, we saw an impact of approximately 170 basis points from weaker sales in holiday seasonal and general merchandise categories.

Second, as expected, we saw a weaker than normal respiratory season, which directly impacted comparable sales by approximately 90 basis points. ***Third-party data showed flu, cold and respiratory activity was down 6% compared to the prior year quarter. In addition, as cough, cold, flu serves as a primary trip driver, there was also an incremental impact from the lower attachment sales.***

Lastly, weather conditions in January led to a headwind of approximately 40 basis

points in the quarter. Retail gross margin declined year-on-year, impacted by higher shrink partly offset by benefits from category performance improvement program.

150. Lastly, turning to the guidance for the upcoming second half of the 2024 Fiscal Year, Defendant Mahajan discussed the narrowing of the adjusted EPS guidance, stating:

I will now turn to guidance. ***We are narrowing our fiscal '24 adjusted EPS guidance to $3.20 to $3.35.*** The updated range incorporates a challenging U.S. retail environment, lower sale leaseback gains and reduced Cencora equity income, ***offset by the execution in pharmacy services and a lower adjusted effective tax rate***.

151. In explaining the "tailwinds," Defendant Mahajan stated that the Company "***continue[s] to see strong execution in our pharmacy services business, which has delivered results ahead of our initial plan to date.*** In addition, we now expect our adjusted effective tax rate to be under 5%."

152. In discussing the "headwinds," Defendant Mahajan explained:

On the headwinds, we expect the challenging retail backdrop will continue to negatively impact our U.S. retail sales in the short term. We now expect fiscal '24 retail comp sales to be down approximately 3%. Second, with the early wind down of the sale-leaseback program, no material gains are expected in the future.

Third, the block sale of Cencora shares in February will reduce equity earnings going forward. Lastly, as discussed with the first quarter results, ***we forecast slightly lower market growth in U.S. pharmacy business compared to our initial guidance***.

153. The statements referenced in ¶¶100-106, 108-109, 111-112, 121-139, 141, 143, and 144-152 above were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose that: (1) WBA did not have sufficient or effective risk management or compliance controls and procedures; (2) as a result, WBA overemphasized confidence in the pharmacy division's ability to carry the Company; (3) this confidence was misplaced as the pharmacy division was not actually equipped to adapt to ongoing hurdles within the industry; (4) as a result,

WBA must undergo significant restructuring in order to create a sustainable model; (5) as a result of withholding this information, shares of the Company's stock were valued at artificially inflated prices; and (6) once these failures were disclosed, the Company would be subjected to financial risk, enhanced regulatory oversight, and reputational harm. As a result of the foregoing, statements about the Company's business, operations and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

**The Truth Emerges**

***June 27, 2024 Press Release***

154.    On June 27, 2024, Defendants issued the 3Q 2024 Press Release. The press release revealed disappointing results, coming in below prior expectations with an adjusted EPS of $0.63, down 36.6% compared to the prior year.

155.    The 3Q 2024 Press Release also lowered the full year guidance for adjusted EPS down to between $2.80 and $2.95. The adjusted maximum was now lower than the originally estimated minimum boundary of EPS from prior quarters.

156.    In describing the disappointing guidance, the 3Q 2024 Press Release identified "challenging pharmacy industry trends and a worse-than-expected U.S. consumer environment."

157.    The 3Q 2024 Press Release also included a comment from Defendant Wentworth, stating that WBA continues "to face a difficult operating environment, including persistent pressures on the U.S. consumer and the impact of recent marketplace dynamics ***which have eroded pharmacy margins***."

***June 27, 2024 Earnings Call***

158.    In the 3Q 2024 Earnings Call that same day, Defendant Wentworth identified that the "quarter's results were not in line with our expectations." He further went on to explain:

For the third quarter, we delivered adjusted earnings per share of $0.63, *reflecting significant challenges in the US Retail Pharmacy business stemming from a worse-than-expected consumer environment and challenging pharmacy industry trends*, partially offset by strength in U.S. Healthcare and International. In light of these factors, we are reducing our full year outlook, which Manmohan will take you through in more detail.

In *US Retail Pharmacy, we witnessed continued pressure on the US consumer. Our customers have become increasingly selective and price-sensitive in their purchases.* In response, we invested in targeted promotion and price decisions which have driven traffic and will generate improved customer loyalty, but they weigh on near-term profitability as we refine our approach. We remain relentlessly focused on enhancing the front of store and creating the right omnichannel experience for our customers while driving in-store efficiencies.

159. In discussing the industry, generally, Defendant Wentworth stated:

We also *continue to face an incrementally challenging pharmacy industry*. Recent trends, such as branded mix impacts and increased regulatory and reimbursement pressures, including fluctuations in NADAC pricing, have negatively impacted pricing dynamics.

Additionally, the script market is growing but continues to trail below pre-pandemic growth levels. These headwinds have affected our performance and are materially weighing on our ability to serve patients profitably.

*We are at a point where the current pharmacy model is not sustainable*, and the challenges in our operating environment require we approach the market differently.

160. Turning to the numbers, Defendant Mahajan identified that in the third quarter, sales increased by 2.5% on a constant currency basis, U.S. Retail Pharmacy grew by 2.3%, international sales grew by 1.6%, and U.S. Healthcare had sales growth of 7.6%. Despite this, Defendant Mahajan admitted:

[O]verall results were below our expectations. Adjusted EPS of $0.63 decreased 37% year-over-year on a constant currency basis. This was driven by a $0.24 impact from lower sale leaseback gains, a challenging US retail environment and recent pharmacy trends.

* * *

*Adjusted EPS declined 25% on a constant currency basis due to the softer US*

***Retail Pharmacy performance and significantly lower sale leaseback gains***. This was partly offset by cost-saving initiatives, improved profitability in US Healthcare and a lower adjusted effective tax rate.

161.    Defendant Mahajan went on to explain the negative results in the U.S. Retail

Pharmacy division, explaining:

Now let me cover US Retail Pharmacy segment. Comparable sales grew 3.5% year-on-year driven by brand inflation in pharmacy and prescription volume, partly offset by a decline in retail sales.

***AOI decreased 48% versus the prior year quarter***. Approximately 70% of this decline relates to lower sale leaseback gains lapping reduced incentive accruals in the prior year and lower Cencora equity income. ***Challenging retail and pharmacy industry trends also negatively impacted AOI in the current period***.

Sale leaseback gains, net of incremental rent expense, resulted in a $277 million headwind to AOI in the quarter. As discussed 3 months ago, we do not anticipate any material benefits from sale leaseback gains going forward. Headwinds in the retail and pharmacy businesses were partly offset by cost savings initiatives.

162.    Moving on to discuss the United States pharmacy division, Defendant Mahajan

revealed:

Pharmacy comp sales increased 5.7% driven by brand inflation and volume growth. Comp scripts, excluding immunization, grew 1.7% in the quarter. We are tracking in line with the overall prescription market year-to-date. However, ***overall prescription market growth remains below expectations primarily due to Medicaid redeterminations***.

***Pharmacy adjusted gross margin declined versus the prior year quarter driven by brand mix impacts, reimbursement pressure reflecting last year's negotiations, lower COVID testing demand and incremental pressure from certain generic launches with procurement dynamics similar to brands***. Recent fluctuations in NADAC drove an incremental $20 million of the partial quarter impact.

163.    Defendant Mahajan then turned the conversation towards the expectations for the

final months of the 2024 Fiscal Year. He explained the disappointing adjustments to the guidance

as follows:

We are lowering our fiscal '24 adjusted EPS guidance to $2.80 to $2.95. The updated range versus our expectations 3 months ago incorporates two key items.

First, the US consumer environment has not improved and is driving higher promotional activity, negatively impacting retail margin. We continue to expect fiscal '24 retail comp sales to be down approximately 3%. *Second is the continuation of worse-than-expected pharmacy margin headwinds. Pharmacy margins in the second half include impact from certain generic launches with procurement dynamics similar to brands, fluctuations in NADAC, inflation and mix within branded drugs and lower overall market growth.*

We are maintaining full year expectations for US Healthcare segment adjusted EBITDA to be breakeven at the midpoint of the guidance range. We continue to expect our adjusted effective tax rate to be under 5%. Our revised full year guidance range implies fourth quarter adjusted EPS of approximately $0.39 at the midpoint.

164.    Defendant Wentworth then continued to explain the plans to potentially offset the

guidance, describing:

So let me begin this discussion around our strategic decisions with our core business, US Retail Pharmacy. The success of the business hinges on an efficient, highly relevant customer experience, and we've launched a multifaceted action plan for improvement.

As the convenient destination for millions of customers and driving $27 billion of retail sales, the store and its digital channels are central to our strategy and consumer experience. But the customer has evolved, demographics and preferences have shifted, and we need to reposition and operate our stores accordingly. *Currently, 75% of our US stores contribute roughly 100% of segment AOI. For the remaining 25% of the stores in our network which are not currently contributing to our long-term strategy, changes are imminent*.

165.    Defendant Wentworth continued:

To start, we are finalizing a multifactor store footprint optimization program which we expect will include the closure of a significant portion of these underperforming stores over the next 3 years. Plans to finalize the number are in motion and we will update you in due course.

For the remaining portion of this cohort, we are taking action to return them to profitability and deliver an improved customer experience. *We will contemplate additional closures if performance does not improve, which includes external factors such as reimbursement rates*.

166.    During the question-and-answer portion of the call, analysts asked extensively

about the disappointing projections and how they impacted the Company's plans for the pharmacy

division. In response to a question by a JPMorgan analyst regarding the future of pharmacy,

Defendant Wentworth responded:

> As far as the future of pharmacy, retail pharmacy in particular, which we talk about the store as part of an overall experience. We are working to essentially meet the consumer where they are today and where they need us to be. And there are a number of elements to that, both in the back of the store and in the front of the store. And so – and I don't want to take as much time as it would take you in detail through all of those pieces.

167.    Taking over for Defendant Wentworth, EVP and President of the United States

Healthcare division Mary Langowski continued:

> Quite frankly, we are laser-focused on being paid fairly for the value we provide. And put simply, ***the playbook is a bit dated and does not account for, nor does it adequately or fairly pay for, the role and value that we think the pharmacist is bringing and delivering services***.
>
> We also don't think it accounts adequately for the complexity that we now face in the system. And it certainly doesn't facilitate putting pharmacotherapy and behavioral interventions at the center of chronic disease management in this country. We think that has to change, and so we're collaborating with our PBM partners across the industry to make those changes.

168.    In response to a question from the same analyst regarding the National Average

Drug Acquisition Cost ("NADAC") pricing, Defendant Mahajan stated:

> This -- so on NADAC, maybe a couple of thoughts. First, we've seen significant fluctuations in the last several months on the index itself. We had $20 million of impact in the quarter, ***but you got to think about that was a partial quarter impact***. We have seen some improvement as the index, again, was updated in June. However, we are taking a very prudent approach as it relates to Q4 and the guidance for the year. And I'd say this is one of the reasons -- the fluctuations we've seen on NADAC is one of the reasons why we have the broader range as we put out the fiscal year guidance at this point.

169.    In response to a question from a Nephron Research analyst regarding the

discounting engaged in by the Company as well as on the potential for NADAC expansion from

Medicaid, Defendant Wentworth replied:

> What I'd say is, first of all, as it relates to commercial and NADAC, I believe what

Rick would say if I passed it over to him would be that, while we do have some commercial contracts that use NADAC, those conversations we're having around sort of neutrality in terms of outcomes. That's actually the easier part of NADAC, quite frankly. As it relates to the gross margin in pharmacy, I will pass it to Manmohan. And as I quickly would point out, gross margin is not only discounting, it is also mi and so forth. And so Manmohan, if you want to talk more about that.

170.    Expanding on Defendant Wentworth's response, Defendant Mahajan stated:

So as you think about the gross margin on the retail pharmacy side, maybe a couple of things there. Let me start on the retail side. And what we've experienced in the third quarter, and we think the trend is going to continue in Q4, *is the environment didn't improve as we anticipated*. And as a result, we focused on investing in price and promotion.

Now we've seen the unit and sales uplift as a result thereof. But at the same time, there was impact on gross margin in the short term. And so that is coming through, and we expect that's going to continue along the same lines in Q4.

The second piece that does impact our gross margin year-over-year is the level of shrink. And I think we talked about shrink in the last couple of calls as well. We have seen it on an increasing trend, and there are a number of actions that Tracey and the team are taking to bring it back to historical normals.

171.    Continuing, Defendant Mahajan discussed the numbers from a pharmaceutical lens, stating:

On the pharmacy side then on the margin, a couple of themes playing out. NADAC is one of them, significant fluctuation as I said earlier in the call. We have seen some level of improvement as the index itself changed in June. But as I said, we're -- at this point, the level of fluctuations we have seen month-over-month, we're just being prudent in terms of what can play out here in Q4.

Outside of that, there last to -- the last point I'd say is there are some market dynamics that we experienced in Q3 as well, and some will play in Q4. And maybe a couple of those to point out is there are certain generic launches where the procurement dynamics continues to be just like branded. And so that is impacting our gross margin on the pharmacy side. And then lastly, I'd say the mix that's coming in on the branded side is also having a negative impact on the margin. So that's maybe overall profile of what's driving our margin in the quarter.

172.    In response to a pair of questions from a Mizuho Securities analyst regarding why prescriptions are not back to pre-pandemic levels and when WBA may be able to stabilize

51

operating profit in the retail segment, Defendant Wentworth replied:

> ***As you've heard us say or let me make sure you hear us say, we actually have a really strong level of conviction around the core business that we are remodeling here***. It will be a very different Walgreens in a lot of ways, a different experience.
>
> But by the same token, we see a clear stabilization and actual growth path for that business. ***It is going to take time. We're not going to give you guidance, but it's quarters, not months***. It's not necessarily multiple years, but it is probably a period of time that we will have to demonstrate to you, and frankly to our consumer, that we are going to deserve their preference.
>
> As it relates to the share dynamics and sort of why share is growing more slowly. And you're right, it's not just Medicaid, although that does impact things. The Medicaid reenrollment challenges, by the way, which many of our urban stores could have played a role in if we were to have a closer relationship with Medicaid. And we are having some of those discussions do -- is one factor.

173.    Turning the response over to Defendant Gates to discuss the pharmacy market more broadly, Defendant Gates responded:

> ***And I think as you look at volume, I think we stated that we are growing with market right now***. So it's not just a Walgreens thing. It is a market dynamic. And so when you look at Medicaid redetermination as an example, Medicaid enrollment really ballooned during the pandemic as obviously they were not moving people outside of the Medicaid coverage.
>
> And so what we've seen is that states has continued to move patients out. We're seeing upwards of -- closer to 18 million to 20 million individuals who have moved out of Medicaid coverage and either have to go out and find coverage like either discount cards, individual plans, or get into commercial plans. And so we've seen a dynamic where they actually have not picked up coverage as quickly, and utilization has dropped.
>
> And so what I think we're seeing is that, pandemic, we were running closer to 4%, 4.5% towards the end of it from a market growth perspective. Pre-pandemic, it was closer to 2.5%. ***And I think what we're seeing right now is we're actually running below the 2.5% from a market perspective. And obviously, we're trying to track with that.***

174.    On this news, the price per share of WBA stock fell $3.47, or 22.16%, from its closing price on June 26, 2024 of $15.66 per share to close on June 27, 2024 at $12.19 per share.

## **Subsequent Developments**

175. Upon learning about the above revelations, analysts reacted negatively when advising investors on purchasing and selling WBA stock. For example, a Raymond James analyst posted a report stating that WBA's Q3 "*was probably the weakest quarter in the US retail pharmacy business we've seen*." The analyst further stated:

> Safe to say there is wood to chop here as WBA has to rationalize ~2,200 stores over the next 3 years, work to revamp the retail experience to compete with the likes of AMZN, and WMT, while also attempting to stabilize the pharmacy business, and find ways to partially monetize its VillageMD position. *We are unaware of any retailer successfully adopting a 'shrink to survive' strategy and WBA's cost savings, to date, have yet to keep up with the decline in the core retail business*.

176. Deutsche Bank also released a report detailing the disappointing Q3 results from WBA, stating that the Company is "in a bit of a downward spiral as *there doesn't seem to be any type of strategy around growth* with all of management's efforts focused on maintaining its retail earnings base and managing cash obligations."

### Repurchases During the Relevant Period

177. During the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company. In total, the Company spent an aggregate amount of *over $69.3 million* to repurchase approximately 3,100,000 shares of its own common stock at artificially inflated prices in October 2023.

178. According to the Form 10-Q the Company filed with the SEC on January 4, 2024 for the quarterly period ended November 30, 2023 (the "1Q 2024 10-Q"), between October 1, 2023 and October 31, 2023, the Company purchased 3,100,000 shares of its common stock for approximately $69,347,000 at an average price of $22.37 per share.

179. As the Company's stock was actually worth only $12.19 per share, the price at which it was trading when markets closed on June 27, 2024, the Company overpaid for repurchases of its own stock by *over $31.5 million in total*.

180.     Thus, in total, during the Relevant Period, the Company overpaid for repurchases of its own stock by **over $31.5 million**.

## DAMAGES TO WBA

181.     As a direct and proximate result of the Individual Defendants' conduct, WBA will lose and expend many millions of dollars.

182.     Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company; its CEO; its EVP, CFO; and its SVP, CPO, any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

183.     Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgements associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

184.     Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

185.     Additionally, these expenditures include, but are not limited to, excessive compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

186.     As a direct and proximate result of the Individual Defendants' conduct, WBA has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their

54

misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

187.    Plaintiff brings this action derivatively and for the benefit of WBA to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of WBA, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of Sections 14(a), 10(b), and 20(a) of the Exchange Act, as well as the aiding and abetting thereof.

188.    WBA is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

189.    Plaintiff is, and has been at all relevant times, a shareholder of WBA. Plaintiff will adequately and fairly represent the interests of WBA in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

190.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

191.    A pre-suit demand on the Board of WBA is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following eleven individuals: Defendants Babiak, Bhandari, Graham, Hanson, Huffines, Jarrett, Lederer, Pessina, Polen, Schlichting, and Wentworth (the "Director-Defendants"). Plaintiff needs only to allege demand futility as to six of the eleven Director-Defendants who are on the Board at the time this action is commenced.

192.    Demand is excused as to all of the Director-Defendants because each one of them

faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

193.   In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

194.   The Director-Defendants knew of the falsity of the misleading statements at the time they were made. Risk management and compliance protocols are an integral part of the Company's business. The maintenance of risk management and compliance procedures was highly material to the Company's core operations, as evidenced by numerous references in the Company's public filings and press releases issued during the Relevant Period.

195.   As Board members of WBA, charged with overseeing the Company's affairs, the Director-Defendants all must have had knowledge of information pertaining to the Company's core operations and the material events giving rise to these claims. Specifically, as Board members of WBA, the Director-Defendants must have been aware of the material facts regarding the issues plaguing WBA's risk management systems and compliance procedures.

196.   In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted WBA to issue materially false and misleading

statements. Specifically, the Director-Defendants caused WBA to issue false and misleading statements which were intended to make WBA appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

197.    Additional reasons that demand on Defendant Wentworth is futile follow. Defendant Wentworth has served as a Company director and Company CEO since October 2023. The Company provides Defendant Wentworth with his principal occupation, for which he receives handsome compensation for his role at the Company. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Wentworth personally made the false and misleading statements in the 1Q 2024 Earnings Call, 2Q 2024 Press Release, and 2Q 2024 Earnings Call that are referenced herein. He also solicited the 2023 Proxy Statement, which contained material misrepresentations and omissions and contributed to his re-election to the Board, as alleged above. For these reasons, Defendant Wentworth breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

198.    Additional reasons that demand on Defendant Babiak is futile follow. Defendant Babiak has served as a Company director since April 2012. She also serves as the Chair of the Audit Committee and as a member of the Finance and Technology Committee. She receives handsome compensation for her role at the Company, including $325,000 in 2023. As a trusted, long-time Company director, she conducted little, if any, oversight of the Company's engagement

in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. She also solicited the 2023 Proxy Statement, which contained material misrepresentations and omissions and contributed to her re-election to the Board, as alleged above. For these reasons, Defendant Babiak breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

199.    Additional reasons that demand on Defendant Bhandari is futile follow. Defendant Bhandari has served as a Company director since September 2022. He also serves as a member of the Finance and Technology Committee and Nominating and Governance Committee. He receives handsome compensation for his role at the Company, including $115,293 in 2023. As a trusted, long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. He also solicited the 2023 Proxy Statement, which contained material misrepresentations and omissions and contributed to his re-election to the Board, as alleged above. For these reasons, Defendant Bhandari breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

200.    Additional reasons that demand on Defendant Graham is futile follow. Defendant Graham has served as a Company director since April 2010. She also previously served as interim-CEO for two months. Defendant Graham also serves as the Lead Independent Director, as the Chair of the Nominating and Governance Committee, and as a member of the Compensation and

Leadership Performance Committee. She receives handsome compensation for her role at the Company, including $366,848 in 2023. As a trusted, long-time Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. She also solicited the 2023 Proxy Statement, which contained material misrepresentations and omissions and contributed to her re-election to the Board, as alleged above. For these reasons, Defendant Graham breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

201.    Additional reasons that demand on Defendant Hanson is futile follow. Defendant Hanson has served as a Company director since October 2022. He also serves as a member of the Compensation and Leadership Performance Committee and Finance and Technology Committee. He receives handsome compensation for his role at the Company, including $84,615 in 2023. As a trusted, long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. He also solicited the 2023 Proxy Statement, which contained material misrepresentations and omissions and contributed to his re-election to the Board, as alleged above. For these reasons, Defendant Hanson breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

202.    Additional reasons that demand on Defendant Huffines is futile follow. Defendant Huffines has served as a Company director since January 2024. As a trusted Company director, he

conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Huffines breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

203.    Additional reasons that demand on Defendant Jarrett is futile follow. Defendant Jarrett has served as a Company director since October 2020. She also serves as a member of the Audit Committee and the Compensation and Leadership Performance Committee. She receives handsome compensation for her role at the Company, including $300,000 in 2023. As a trusted, long-time Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. She also solicited the 2023 Proxy Statement, which contained material misrepresentations and omissions and contributed to her re-election to the Board, as alleged above. For these reasons, Defendant Jarrett breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

204.    Additional reasons that demand on Defendant Lederer is futile follow. Defendant Lederer has served as a Company director since April 2015. He also serves as the interim Chair of the Finance and Technology Committee, as well as a member of the Compensation and Leadership Performance Committee and Nominating and Governance Committee. He receives handsome compensation for his role at the Company, including $315,000 in 2023. As a trusted, long-time

Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. He also solicited the 2023 Proxy Statement, which contained material misrepresentations and omissions and contributed to his re-election to the Board, as alleged above. For these reasons, Defendant Lederer breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

205.    Additional reasons that demand on Defendant Pessina is futile follow. Defendant Pessina has served as a Company director since April 2012, and as Executive Chairman of the Board since March 2021. The Company provides Defendant Pessina with his principal occupation, for which he receives handsome compensation for his role at the Company. As a trusted, long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. He also solicited the 2023 Proxy Statement, which contained material misrepresentations and omissions and contributed to his re-election to the Board, as alleged above. For these reasons, Defendant Pessina breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

206.    Additional reasons that demand on Defendant Polen is futile follow. Defendant Polen has served as a Company director since July 2023. He also serves as a member of the Finance and Technology Committee. He receives handsome compensation for his role at the Company,

including $14,130 in 2023. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. He also solicited the 2023 Proxy Statement, which contained material misrepresentations and omissions and contributed to his re-election to the Board, as alleged above. For these reasons, Defendant Polen breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

207. Additional reasons that demand on Defendant Schlichting is futile follow. Defendant Schlichting has served as a Company director since October 2006. She also serves as the Chair of the Compensation and Leadership Performance Committee and as a member of the Audit Committee. She receives handsome compensation for her role at the Company, including $319,974 in 2023. As a trusted, long-time Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. She also solicited the 2023 Proxy Statement, which contained material misrepresentations and omissions and contributed to her re-election to the Board, as alleged above. Moreover, Defendant Schlichting has materially benefitted from the Individual Defendants' breaches of fiduciary duty alleged herein, having made an insider sale while the Company's stock price was artificially inflated as a result of the false and misleading statements alleged herein, with personal proceeds of $350,567. For these reasons, Defendant Schlichting breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

208. Additional reasons that demand on the Board is futile follow.

209. Each of the Director-Defendants, individually and collectively, faces a substantial likelihood of liability as a result of their intentional or reckless approval of the unnecessary and harmful repurchases that caused the Company to overpay *by approximately $31.5 million dollars* for its own common stock during the Relevant Period. The Director-Defendants, as alleged herein, were aware or should have been aware of the misinformation being spread by the Company and yet approved the repurchases. Thus, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

210. Defendants Babiak, Jarrett, and Schlichting (the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Audit Committee Charter. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

211. All of the Director-Defendants breached the duty of candor by making, or causing the Company to make, false and misleading statements regarding the Company's business,

operations, and prospects, despite having knowledge of the falsity of those statements. The Director-Defendants may not be indemnified for breaching the duty of candor. As a result, all of the Director-Defendants face a substantial likelihood of liability and cannot evaluate a demand with disinterest. Therefore, demand is futile, and thus, excused.

212. In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In further violation of the Code of Conduct, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

213. The Director-Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

214. The acts complained of herein constitute violations of fiduciary duties owed by

WBA's officers and directors, and these acts are incapable of ratification.

215.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of WBA. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, inter alia, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of WBA, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

216.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause WBA to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

217.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least six of the Director-Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## **FIRST CLAIM**

**Against Individual Defendants for Violations of**

## Section 14(a) of the Securities Exchange Act of 1934

218.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

219.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

220.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

221.    Under the direction and watch of the Director-Defendants, the 2023 Proxy Statement failed to disclose that: (1) WBA did not have sufficient or effective risk management or compliance controls and procedures; (2) as a result, WBA overemphasized confidence in the pharmacy division's ability to carry the Company; (3) this confidence was misplaced as the pharmacy division was not actually equipped to adapt to ongoing hurdles within the industry; (4) as a result, WBA must undergo significant restructuring in order to create a sustainable model; (5) as a result of withholding this information, shares of the Company's stock were valued at artificially inflated prices; and (6) once these failures were disclosed, the Company would be

subjected to financial risk, enhanced regulatory oversight, and reputational harm. As a result of the foregoing, statements about the Company's business, operations and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

222.    Under the direction and watch of the Director-Defendants, the 2023 Proxy Statement also failed to disclose, *inter alia*, that: (1) although the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2023 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

223.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2023 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2023 Proxy Statement, including election of directors, advisory approval of executive compensation, and ratification of the appointment of an independent registered public accounting firm.

224.    As a result of the material misstatements and omissions contained in the 2023 Proxy Statement, Company shareholders voted to re-elect Defendants Babiak, Bhandari, Graham, Hanson, Jarrett, Lederer, Pessina, Polen, Schlichting, and Wentworth to the Board, as well as elect Defendant Huffines to the Board for the first time, thus allowing them to continue breaching their fiduciary duties to WBA.

225.    The Company was damaged as a result of the Individual Defendants' material

misrepresentations and omissions in the 2023 Proxy Statement.

226.    Plaintiff, on behalf of WBA, has no adequate remedy at law.

## SECOND CLAIM

**Against the Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934**

227.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

228.    The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding WBA. Not only is WBA now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon WBA by the Individual Defendants. With the price of its common stock trading at artificially inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase millions of its own shares at artificially inflated prices, damaging WBA.

229.    During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in conference calls, and periodic and current reports filed with the SEC.

230.    The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about WBA not misleading.

231. The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by WBA.

232. The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

233. By virtue of the foregoing, the Individual Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

234. Plaintiff, on behalf of WBA, has no adequate remedy at law.

### THIRD CLAIM

**Against the Individual Defendants for Violations of Section 20(a) of the Securities Exchange Act of 1934**

235. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

236. The Individual Defendants, by virtue of their positions with WBA and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of WBA and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence

and exercised the same to cause WBA to engage in the illegal conduct and practices complained of herein.

237.     Plaintiff, on behalf of WBA, has no adequate remedy at law.

## FOURTH CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

238.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

239.     Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of WBA's business and affairs.

240.     Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

241.     The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of WBA.

242.     In breach of their fiduciary duties owed to WBA, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) WBA did not have sufficient or effective risk management or compliance controls and procedures; (2) as a result, WBA overemphasized confidence in the pharmacy division's ability to carry the Company; (3) this confidence was misplaced as the pharmacy division was not actually equipped to adapt to ongoing hurdles within the industry; (4) as a result, WBA must undergo significant restructuring in order to create a sustainable model;  (5) as a result of withholding this information, shares of

the Company's stock were valued at artificially inflated prices; and (6) once these failures were disclosed, the Company would be subjected to financial risk, enhanced regulatory oversight, and reputational harm. As a result of the foregoing, statements about the Company's business, operations and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

243.    In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced herein, which renders them personally liable to the Company for breaching their fiduciary duties.

244.    Also, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

245.    In yet further breach of their fiduciary duties, during the Relevant Period, the Individual Defendants willfully or recklessly caused the Company to repurchase millions of shares of its own common stock at artificially inflated prices before the fraud was exposed, while two of the Individual Defendants engaged in lucrative insider sales, netting proceeds of over $371,000.

246.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of WBA's securities.

247.    The Individual Defendants had actual or constructive knowledge that they had

caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of WBA's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

248.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

249.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, WBA has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

250.    Plaintiff, on behalf of WBA, has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Unjust Enrichment

251.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

252.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, WBA.

253.    The Individual Defendants either benefitted financially from the improper conduct or received bonuses, stock options, or similar compensation from WBA that was tied to the

performance or artificially inflated valuation of WBA, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct. This includes lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

254.    Plaintiff, as a shareholder and a representative of WBA, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

255.    Plaintiff, on behalf of WBA, has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Abuse of Control

256.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

257.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence WBA, for which they are legally responsible.

258.    As a direct and proximate result of the Individual Defendants' abuse of control, WBA has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

259.    Plaintiff, on behalf of WBA, has no adequate remedy at law.

## SEVENTH CLAIM

### Against Individual Defendants for Gross Mismanagement

260.    Plaintiff incorporates by reference and realleges each and every allegation set forth

above, as though fully set forth herein.

261.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of WBA in a manner consistent with the operations of a publicly held corporation.

262.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, WBA has sustained and will continue to sustain significant damages.

263.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

264.    Plaintiff, on behalf of WBA, has no adequate remedy at law.

## EIGHTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

265.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

266.    The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

267.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused WBA to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

268.    In addition, the Individual Defendants caused the Company to repurchase millions of shares of its own common stock at artificially inflated prices, thereby wasting the Company's

assets.

269.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

270.    Plaintiff, on behalf of WBA, has no adequate remedy at law.

### **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of WBA, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that each of the Individual Defendants have breached or aided and abetted the breach of their fiduciary duties to WBA;

(c)    Determining and awarding to WBA the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing WBA and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect WBA and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of WBA to nominate at least five

candidates for election to the Board; and

      3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e)    Awarding WBA restitution from Individual Defendants, and each of them;

(f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)    Granting such other and further relief as the Court may deem just and proper.

Dated: August 27, 2024           Respectfully submitted,

*/s/ Timothy Brown*
Timothy Brown
**THE BROWN LAW FIRM, P.C.**
767 Third Avenue, Suite 2501
New York, NY 10017
Tel: (516) 922-5427
Fax: (516) 344-6204
tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

## **VERIFICATION**

I, Mark Tobias, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 19__ day of August, 2024.

DocuSigned by:

_____
Mark Tobias